8488

## MAY v. THOMAS.

REAL PROPERTY—LANDLORD AND TENANT—LIFE TENANT—REMAINDER-MEN.—Where a life tenant under a will rents agricultural lands for a year and dies within the year, the remainderman cannot collect of the tenant for the year any other than the rent contracted for with the life tenant.

MR. JUSTICE HYDRICK, MR. CHIEF JUSTICE GARY *concurring, thinks the remaindermen are entitled to make a new contract with the tenant for the balance of the year.*

Before GAGE, J., Union, May, 1912. Modified.

Action by Jeannette Hill May *et al.* against Margaret S. Thomas *et al.*

The report of the special master, J. G. Hughes, is:

"This is the second report made in this case, the first report being dated June 20, 1910, and being on file in the office of the clerk of the Court for this county, which report determined, among other special matters under the order of reference, the interests of the various parties to this action. The second and final reference herein I held on the 24th day of January, 1911, and this is a report thereon.

"George W. Hill held a life estate in the lands described in the complaint herein, the partition of which and the rents and profits of which are at issue in this case. The question of partition, interests of the parties, etc., has already been settled under my previous report, and the matter of accounting for rents and profits was heard by me at the above mentioned reference held on the 24th day of January, 1911.

"George W. Hill died on the 2d day of May, 1909. Some years previous to his death his daughter, Mrs. Margaret S. Thomas, and others purchased his life estate in certain tracts of land involved in this suit. The status of these parties other than Mrs. Thomas will not be considered in this report, as they were not made parties to this suit.

"George C. Wood, a son-in-law of George W. Hill, held from Mr. Hill a lease of other lands in which Mr. Hill had not been divested of his life estate up to the time of his death. This lease by its terms covered the year 1909, and provided that Mrs. W. B. May, a daughter, and Reuben S. Thomas, a son-in-law of Mr. Hill, should have such lands for use as George C. Wood saw fit to let them have. Under this arrangement there was assigned to Mrs. May a seven (7) horse farm, which she rented out with the exception of a one (1) horse farm managed by her husband, W. B. May; and to Reuben S. Thomas a two (2) horse farm, which he rented out. Wood himself worked on shares with his tenants a six (6) horse farm and rented out seven and one-half (7½) horse farms, one of which it seems that he personally managed.

"Just here it might be well to state that it appears from the testimony that in all these transactions Geo. C. Wood was acting for his wife, Mrs. Ruth Hill Wood, W. B. May for his wife, Mrs. Jeannette Hill May, and Reuben S. Thomas for his children, Guy Hill Thomas and Roland Farr Thomas. So, hereafter in this report these representative parties will be referred to in order to simplify, and the Court will understand that they are referred to in such representative capacity.

"I think that there can be no doubt that up to the first of May, 1909, Mrs. Margaret S. Thomas was protected in the holding of the land under her charge by the life interest therein of George W. Hill, which interest she had purchased. Again, George C. Wood, W. B. May and Reuben S. Thomas were protected for the same period under the lease of George W. Hill to George C. Wood. So, for the first third of the year 1909, the question is easily disposed of. However, then arises a complication as to the interests of the parties in possession, who are remaindermen, and others who are also remaindermen, as to what shall be the basis of accounting as to rents and profits by those in possession—the parties in possession and other remaindermen being tenants in common. The positions of the parties to this suit are very much at variance, and I cannot accept in full the contentions of any one of them.

"It seems to be a well settled principle of law in this State that where the tenant in common is in possession of lands and his holding is not tortious and there is no ouster —and in this case there is no evidence of tortious holding or ouster—that tenant in common is liable to account to his cotenants only for their *pro rata* share of the net profits arising from his use and occupation of the premises actually utilized by him or under his management. He would be held accountable for rental value only when his use and occupation is tortious. This seems to be the law as recog-

nized in this State. *Jones* v. *Massey,* 14 S. C., page 307;
*Cain* v. *Cain,*. 53 S. C., page 355.

"However, when one tenant in common leases the prem-
ises to a stranger and collects rents thereon, such tenant in
common must account to the other tenants in common for
the rents so collected. He becomes a trustee to this extent
for the benefit of all.

"It is conceded by all interested, I believe, that where
there are several tenants in common each is entitled to culti-
vate his *pro rata* share of the lands owned jointly independ-
ently of the others. In this case this principle applies to the
year 1910, where all the tenants in common had an oppor-
tunity of proceeding on this plan at the beginning of the
year; and it appears that the parties to this suit did that for
the year 1910 and there is no ground for contention as to the
rents and profits for that year. However, for the year
1909, at the beginning Geo. W. Hill, the life tenant, was
alive; and at his death in May after the year was consider-
ably advanced some of the remaindermen were in possession
and were cultivating the lands. It was then too late for all
the remaindermen to take charge of their *pro rata* shares,
and the statutes of this State protecting a person who had
gone into possession under the life tenant would have pre-
vented such a procedure. So, plainly, there was no equal
opportunity to all the cotenants or remaindermen in 1909,
and in law and equity the same principle cannot be applied
to 1909 as to 1910.

"In the case at issue, immediately upon the death of
George W. Hill the title of the lands in question vested in
the remaindermen, and they became tenants in common.
The parties in possession were protected for one-third of the
year—up to the first of May, 1909—by the life estate of and
the lease from George W. Hill. But from that time on they
became accountable to all the tenants in common upon the
principles already set forth.

11—94

"To take them up in order:

"Mrs. Margaret S. Thomas must account for sixty-six hundred and fifty (6,650) pounds of cotton collected in 1909 as rent from tenants, less a deduction of one-third on account of her right to the life estate up to the death of George W. Hill by reason of purchase. She should be credited with taxes paid as follows: 1909, eighty-six ($86) dollars; 1910, seventy dollars and sixty-four cents ($70.64).

"Geo. C. Wood held thirteen and one-half (13½) horse farms. Six of these he cultivated himself with laborers on shares of crops and on them made no profit, and consequently cannot be held liable thereon to the other cotenants of his wife. Seven and one-half horse farms he rented and collected rents thereon to the extent of seventy-five hundred (7,500) pounds of cotton, for which he must account, less a deduction of one-third on account of the lease from George W. Hill, which was good and valid for the first third of the year. He should be credited with taxes paid to the extent of one hundred and eighty-seven dollars and four cents; funeral expenses of Geo. W. Hill, eighty dollars; one-half cost of drainage lands as required by the county commissioners, twelve and 50-100 dollars; also, I think it proper to allow him sixteen and 66-100 dollars (two-thirds of $25, the value of services as testified of managing a one-horse farm) for management of one of these seven and one-half farms which he worked himself and on which he made the rent.

"W. B. May had a seven (7) horse farm, one of which he worked himself and on which he made the rent, and rented out the other to six others. He collected seven thousand (7,000) pounds less 338 pounds of cotton in rents for which he must account, less a deduction of one-third on account of the lease from Geo. W. Hill to George C. Wood. He should be credited with one-half the cost of drainage required by the county commissioners, twelve and 50-100 dollars; insurance paid on buildings, twenty dollars; town taxes paid in Carlisle, one and 50-100 dollars; and an allowance of six-

teen and 66-100 dollars (two-thirds of $25) for management of the farm he worked and on which he made the rent.

"Reuben S. Thomas held a two (2) horse farm from which he collected in rents two thousand (2,000) pounds of cotton, for which he should account, less one-third deduction under the lease from Geo. W. Hill to Geo. C. Wood.

"The testimony is uncontradicted that 1,000 pounds of lint cotton is the standard rent for a one-horse farm in the community where the lands in question are located, and the parties renting out the lands testified that they rented it for that standard rent. It is admitted that the cotton to be accounted for shall be so done at the price of 12½ cents per pound. Of course, the amounts to be accounted for by the various parties mentioned are to be paid into the general fund for distribution and they are to be credited with or to receive back from the fund their *pro rata* shares.

"I herewith transmit to the Court the testimony and exhibits introduced at the reference held on the 24th day of January, 1911."

The Circuit decree is:

"This is a contest betwixt the heirs at law of the late Geo. W. Hill, deceased, about a division between them of the rents off the estate lands for the years 1909 and 1910.

"More particularly, the contest is betwixt the widow and children of his dead son, Roland, on the one side, and three living daughters on the other side. These daughters are Mrs. Margaret S. Thomas, Mrs. Wood and Mrs. May.

"All parties have excepted to the report of the special master; and the exceptions are too numerous to set out here.

"But there are few issues of law, and practically no issues of fact.

"The late George W. Hill held only an estate for his own life in the lands in issue.

"He died 2 May, 1909. He had theretofore sold his life estate in a part of his lands to Margaret S. Thomas *et al.;*

and he had theretofore leased his life estate in the balance of
the land to Geo. C. Wood, the husband of his daughter,
Ruth, for the year 1909, for $150.

"Thereupon Wood, pursuant to a suggestion in the lease
from Hill, assigned to Mrs. May a seven-horse farm; and to
Reuben Thomas' children (the grandchildren of Hill) a
two-horse farm, and Wood reserved for himself a six-horse
farm and a seven and a half-horse farm.

"The issue is this: are the tenants under the life tenant
liable to pay the remaindermen a reasonable rent for the
last eight months of 1909, or simply a two-thirds of what
they had contracted with Geo. W. Hill to pay for the year?

"The master found for the former view; and the defend-
ants and some of the plaintiffs contest that view; it is really
contested by these children and remaindermen who happened
to be in possession as tenants under Hill.

"It is a pure accident that the undertenants happen to be
remaindermen; and they will be dealt with as undertenants
when it comes to their liability to account for rent.

"Had Hill leased the land to a stranger for 1909 for $150
then plainly under the statute Hill's estate would have been
entitled to collect from that stranger as much as $50 of that
sum for rent.    Code of Laws, No. 2408.

"Before the statute, and by the law, when the life tenant
died amid the year, the rent due to him was not enforcible at
all if the undertenant was ousted by the remaindermen.

"The ground of that novel holding was that the contract
was entire and the rent must be entire; it was not then
believed that a half a loaf was better than no loaf at all.

"The act to mend that mischief, embodied in No. 2908-9
of the Code of Laws, came from England and was written
into our statutes; and it provides that which the executor of
the life tenant may collect from the undertenant for rent
from the life tenant had died amid the year; and it provides
nothing more.

Rep.]                    November Term, 1912.

"These two sections, about one matter, make no reference to any right or remedy of the remaindermen touching the rent to accrue for that part of the year after the death of the life tenant,—eight months in the case at bar.

"Under that statute, therefore, the remaindermen could collect no rent for eight months of 1909.

"But another statute was enacted later, in 1789, and it had reference principally at the start to the hiring out of slaves. The dead bones of slavery are embodied all through our law.

"The statute, though *impaired,* rented lands along with slaves; and it provides that an undertenant who had leased lands for a life tenant, dead amid the year, should not be dispossessed therefrom until the crop of that year had been harvested; and that the undertenant should secure (to the remainderman) the payment of the rent when due.

"The statute did not declare that the life tenant, acting for himself and the remaindermen, might make a lease for a year at a fixed rent, of which the executor of the life tenant (dead amid the year) should have so much of that rent, and the remaindermen should have so much of that rent.

"Indeed, it is doubtful if a life tenant could be thus empowered to bargain away the rights of the remaindermen.

"When the remaindermen came into their own, the undertenant had one of two courses open to him; he might make new terms with the remaindermen for the eight months yet to lapse, or he might quit the premises; he could not be dispossessed if he offered to do the former, for that is the mandate of the statute.

"As I read his report, the master has particularly charged the undertenant according to the foregoing principles; and I am content to adopt his findings.

"And in the year 1910, I see no reason to dissent from the master.

"It is, therefore, ordered, that the report of the special master be confirmed."

The defendants, Edith Lyles Hill, Roland Glenn Hill, Hamilton Hill and Coleman Lyles Hill, appeal on the following exceptions:

1. "That his Honor, the presiding Judge, erred in finding as a matter of fact that the special master in his report of March 16, 1911, held that the parties to this action who were in the occupation of the land here involved for the year 1909 were liable to account to the remaindermen for two-thirds of the rental value of the said land for the year 1909; whereas, his Honor should have found and held that the special master in his said report erroneously held that the parties who were in the use and occupation of the said land for the year 1909 were liable to account to the remaindermen as tenants in common, for two-thirds of the rents and profits received from said land during the year 1909.

2. "That his Honor, the presiding Judge, erred in overruling the exceptions of the defendants, Edith Lyles Hill, Roland Glenn Hill, Hamilton Hill and Coleman Lyles Hill, to the said report of the special master, which exceptions were as follows, to wit:

"(a) That the referee erred in finding as a matter of fact that these defendants had an equal opportunity with the other tenants in common to use and occupy their *pro rata* part of the real estate involved for the year 1910, and in holding, as a matter of law, that the other cotenants were not liable to account to those defendants for any part of the rental value or rents and profits received by them from the lands during the year 1910; whereas, he should have held that the evidence establishes that these defendants did not have an equal opportunity to so use and occupy their *pro rata* portion of the said land but were, in effect, ousted from the use and occupation of said land during the year 1910; that practically all of the available lands were taken into possession and rented out to third parties by the other cotenants, without the consent of these defendants; and that thereby the said cotenants became legally liable, as trustees, to account to

these defendants for their *pro rata* part of the rents and profits so collected and received.

"(b) That the special master erred in holding that the plaintiff, Mrs. Ruth Hill Wood, by and through her husband, Geo. C. Wood, was not liable to account for two-thirds (2-3) of the rental value of a six (6) horse farm cultivated by the said Geo. C. Wood, with laborers on shares of crop, during the year 1909; in finding and holding that the said Geo. C. Wood made no profit in the cultivation of the said farm, and in holding as a matter of law that the alleged fact that he made no profit would release him from any liability to account for the rental value of the said farm to the other cotenants of his said wife; whereas, he should have held that the said Geo. C. Wood, for his wife, Mrs. Ruth Hill Wood, one of the plaintiffs, was in the use and occupation of said farm, not as a tenant in common, who was liable to account by and under the rule of rents and profits, but as an ordinary tenant in the use and occupation of real estate belonging to third parties, for which he was accountable for the rental value.

"(c) That the special master erred in holding that the plaintiffs, Mrs. Jeannette Hill May, and Mrs. Ruth Hill Wood, were entitled to a credit of sixteen and 66-100 ($16.66) dollars each for the value of services rendered by their husbands, W. B. May and Geo. C. Wood, in managing two one-horse farms during the year 1909.

"(d) That the special master erred in failing to hold as a matter of law that the parties to this action who were in the use and occupation of the land involved during the year 1909, were liable to account to the remaindermen for two-thirds (2-3) of the rental value of the premises so used and occupied by them during the same year, 1909.

"(e) That the said special master erred in failing to find as a matter of fact that the plaintiffs, Mrs. Jeannette Hill May, and the defendant, Mrs. Margaret S. Thomas, were in the use and occupation of, and received the rents and profits

from, more than their respective *pro rata* shares of the land during the year 1910, and that they should account for and pay over to their cotenants any amount in excess so collected and received."

The defendant, Margaret S. Thomas, appeals on the following exceptions:

1. "Because the Circuit Judge erred in sustaining and affirming the report of the special master in so far as the special master found and held that the defendant, Margaret S. Thomas, was liable to account to her cotenants for two-thirds of the rents received by her for the part of the Hill estate used by her during the year 1909.

"Margaret S. Thomas had purchased her father's life estate in about five hundred acres of the twenty-five hundred acres owned by him for life, and had been occupying and using it for many years and was so doing when he died in May, 1909. Upon his death she with her cotenants became the absolute owners of the entire estate, including the tract occupied by her. It was error upon the part of the master to charge her with rents for the balance of the year, and the Circuit Judge committed error in sustaining the master in so holding.

2. "The Circuit Judge erred in treating Margaret S. Thomas tenant of George W. Hill during the part of the year 1909 until his death in May and as the tenant of her cotenants for the balance of the year after his death. She was the undisputed owner of the life estate in the land occupied by her so long as her father lived, and she was in no sense his tenant. Sections 2408, 2409 and 2410 of the Code had no application to her occupancy. These sections only apply to tenants or persons holding a life estate in cases where the life estate ends in the midst of the crop year. And these sections only apply as between undertenants of the holder of a life estate and the remaindermen.

3. "The Circuit Judge erred in holding that Margaret S. Thomas, the sole holder and owner of the life estate and

cotenant in the remainder, and in possession of no more than her reasonable portion of the land, was liable to account to the other cotenants to make them equal when it was not her fault that they did not occupy their portion of the land or collect their portion of rents.·

4. "The Circuit Judge erred in overlooking and not duly considering the fact that Margaret S. Thomas did not occupy more than her reasonable share of the land in 1909, and that if the other cotenants did not get their full share of the land or rents for the year 1909 it was not her fault, but their negligence or misfortune. The master and Circuit Judge concur in holding that Mrs. Margaret S. Thomas was not liable to account for rents for 1910, when she occupied the same land she occupied in 1909.

5. "The Circuit Judge erred in practically holding Mrs. Margaret S. Thomas accountable for the negligence or misfortune of her cotenants in not collecting their share of the rents or occupying their share of the land in 1909 by charging Mrs. Margaret S. Thomas with rents collected by her in 1909 and not charging her for 1910, when she occupied the same land and collected practically the same rents each year.

6. "It is error of law to compel Mrs. Margaret S. Thomas to account for rents for 1909 when she went into possession as owner of the life estate at the beginning of the year and continued in possession as a cotenant after the death of her father of her reasonable portion of the land."

Plaintiffs' exceptions:

"Because his Honor erred, therein:

I. "In failing to pass upon and sustain the exceptions of plaintiffs to the second report of the special master, numbered, respectively, 4, 5, 6, 7, 10, 12 and 15, which are as follows:

" '4. In not finding, holding and reporting, that Jeannette Hill May, Ruth Hill Wood, Margaret S. Thomas, and the widow (Edith Lyles Hill) and children of Roland G. Hill, deceased (as one unit), were entitled to and owned one

60-324 interest in all the land partitioned; and that Mrs. S. Lou Crawford (representing Sallie G. Willard) and R. S. Thomas, as guardian and guardian *ad litem* of Roland Farr, and Guy Hill Thomas, were each entitled to 42-324 parts thereof.

" '5. In not finding, holding and reporting, that there were thirty-four and one-half one-horse farms, on all the land owned in common, and of this number the plaintiffs, Jeannette H. May and Ruth H. Wood, were each entitled to six and one-fourth farms; and in not reporting the total number of farms on the land; and the number each cotenant was entitled to the use of as his or her share.

" '6. In not finding, holding and reporting, that three of the farms on the common land were in the possession and control of others than the cotenants for the year 1909, to wit, two in the possession of J. Ed Gregory, and one in possession of Charner Dawkins, as purchaser of the life estate of G. W. Hill therein, and of which the plaintiffs had no possession or control.

" '7. In not finding, holding and reporting, that the rents for year 1909 on these three farms was not paid; that the cotenants did not reside on the land (Edith Lyles Hill and the children of Roland G. Hill and Mrs. Lou Crawford, representing Sallie G. Willard) ; allowed the same to go uncollected and to be lost; and made no effort to collect the same, and thereby lost the same through their neglect, and failure to look after their interests.

" '10. In not finding, holding, and reporting, that none of the other cotenants made any demand on the plaintiffs or R. S. Thomas, for security for the payment of the rent provided for in the said lease, or for possession of any part thereof, or for an agreement to pay any other rent than agreed to be paid by them in said lease for that year or served any notice of any kind relating thereto.

" '12. In failing to find and report the large loss, accruing and falling upon Ruth H. Wood and her husband from

the operating and carrying on of the farming operation on the excess over his share of said land, to wit, two hundred twenty-six and 38-100 dollars; and in not finding, holding and reporting that they should be given credit therefor in accounting.

" '15. In not holding, and reporting, that under the evidence and the facts of this case there is nothing due to any of the cotenants by plaintiffs or R. S. Thomas; and in not stating the accounts between the cotenants and filing the same with his report.'

"These exceptions make the points, respectively, that the master erred, in not finding and reporting, the respective interests of the remaindermen, in the said land, to wit, as specified in said exceptions, the number of one-horse farms of tillable land on the entire place, to wit, 34½, and that Jeannette Hill May and Ruth Mill Wood, were each entitled to six and one-half horse farms; and the number of farms (one-horse) each remainderman was entitled to the use of; that three one-horse farms, of said land, were not on the land used by cotenant remaindermen, but in the possession of strangers, over which plaintiffs had no control; that the rents of these three farms was not paid; that the nonoccupying cotenants neglected to collect the same and made no effort to collect the same, and should be charged with the same in an accounting; that none of the remaindermen made any demand on the remaindermen in possession at the death of G. W. Hill for any security for the rent, or for possession of any part of the land held by them; or for any new agreement as to the rent of the same; that Ruth Hill Wood, through the agency of her husband, lost the $226.38 on the land farmed by her on said place for 1909.

"These were material matters in the case without passing upon which, no final determination or rights could be had; the evidence was uncontradicted and undisputed to sustain the facts alleged, and as the master failed to pass upon them, and they were before the Court on exceptions the Court

should have passed upon them and sustained the exceptions; and this Court should do so.

2. "In not stating the undisputed fact as found by the special master, that W. B. May and Geo. C. Wood in all matters relating to this land were acting for and represented their wives, Jeannette Hill May and Ruth Hill Wood. The master's report shows this finding and report.

3. "In misstating the issues between the cotenants in possession of part of the common land for 1909, and the other remaindermen, by omitting entirely to mention and consider and pass upon the rights of those in such possession as cotenants, because he says, it was an accidental thing.

4. "In holding and stating that one of two courses was open to the cotenants, holding under the lease from the life tenant, when the remaindermen came into their own; he (they?) could either make new terms with the remaindermen, or he could quit the premises; he could not be dispossessed, if he did the former; it being submitted that this is an erroneous statement of the rights of any tenant much less a cotenant, under sec. 2410, vol. I, Code of Laws, in this: that he places the whole duty of action on the tenant in possession and takes all duty of action and all responsibility from the remaindermen; thus wrongfully limiting the rights of the tenant and extending the rights of the remaindermen.

5. "In not passing upon and sustaining plaintiffs' exceptions 2, 3, 8 and 9, to the special master's report, which are as follows:

" '2. In finding and reporting, substantially that the occupying cotenants were for that year (1909) tenants of all the cotenants, and must account to the nonoccupying cotenants as such upon a basis of perfect equality.

" '3. In finding and reporting, that the cotenants occupying or residing on the common land during the year 1909, after the death of G. W. Hill, as tenants of all the cotenants liable to account to the other cotenants for all the rents and profits received by each, from the land he or she worked or

used, at the usual rents per horse farm for that section, upon an exact basis of equality, and without allowing the tenants residing thereon credit for the full value of their services in attending to and carrying out the working of the lands used by him or her for that year, including the liabilities attaching hereto.

" '8. In not finding, holding and reporting that Jeannette Hill May, Ruth H. Wood, and their husbands, plaintiffs, and R. S. Thomas, for his infant children, held the lands for which they were severally possessed of the common land for the year 1909, under and by virtue of a written lease from G. W. Hill, the life tenant of the land; and that as against the other cotenants, they were entitled to hold the said lands for the remainder of the year 1909, after the death of the life tenant, at the rent specified and agreed to be paid therein; and to account for the two-thirds thereof, only to the other cotenants; and that in the absence of any demand for security continuing to hold thereunder and under the terms thereof for the payment of the said rent on them, by the other cotenants, such right was waived; and they acquiesced in the said holders under the lease, continuing to hold thereunder and under the lease.

" '9. In not finding, holding and reporting, that by the terms of the said lease, the said plaintiffs and the said R. S. Thomas, were to pay as rent for the land occupied by them, the sum of one hundred and fifty dollars for the year 1909, and also to pay such further sum as was reasonably sufficient to support the said G. W. Hill for that year; that is, to furnish him with a support; and that two-thirds of such amount would be and was the amount for which they would be liable to account in this action, subject to all proper credits.'

"These exceptions make the points, that the special master erred in holding that the cotenants in possession of part of the land at the death of the life tenant, under lease from him, were liable to the remaindermen as tenants, for the full

usual rent of all the land held by them (1,000 pounds lint per one-horse farm) for the remainder of the year (1909) ; and in not holding that they were tenants under their said lease and could be held only for two-thirds (2-3) of the rent agreed to be paid therein, one hundred and fifty dollars, and a support for the life tenant.

6. "In not holding that under sec. 2410, vol. I, Code of Laws, the cotenants in possession are only liable to hold to the remaindermen for two-thirds (2-3) of the rent agreed to be paid by them in the lease from the life tenant, Geo. W. Hill.

7. "In not passing upon and sustaining plaintiffs' 1st, 11th and 13th exceptions to the special master's report, which are as follows :

" '1. In finding and reporting, that for the year 1909, the principle that one cotenant cannot be held accountable to his cotenants, except for the excess of his or her share of the common property worked or used by him or her, did not apply to this case for the year 1909, but that the cotenants in possession at the death of G. W. Hill, must account for all the rents and profits received by him or her for that year to the other cotenants, upon an even and equal basis, whether he or she worked more or less than her fair share of the said land for that year.

" '11. In not finding, holding and reporting that even if under any view plaintiffs and R. S. Thomas under and by virtue of their written lease and under the terms and conditions thereof ; and that all rights thereunder were avoided by the death of G. W. Hill, the life tenant, in May, 1909, that then the plaintiffs and R. S. Thomas, were in possession of the land as tenant in common, and not as renters of the other cotenants; and that as tenants in common so holding, they were and could be only liable to account for the rent and profits, of such part of said land as was used and rented by each severally, in excess of his or her share of all the common land subject to all proper credits and allowances.

" '13. In not holding and reporting, that as tenants in common in possession the plaintiffs, M. S. Thomas and R. S. Thomas, should and could only be held to an account for the rents and profits of the land used in excess of their respective shares, and not for the rental value.'

"These exceptions make the points, that the special master erred in holding, that the general rule of law that a cotenant in possession can only be held for rents and profits of the common land, used by him in excess of his proper share thereof, does not apply to the cotenants in possession of this land at the death of Geo. W. Hill, the life tenant; and in not holding that if the lease was destroyed by the death of the life tenant, the said remaindermen were in possession as · cotenants, and should only be required to account according to that rule.

8. "In not holding that if the lease under which the remaindermen held at the time of the death of G. W. Hill, was destroyed or rendered invalid in any way or for any cause, the remaindermen in possession of part of the land for the year 1909, were in of their new right, held as tenants in common, and as such, each could be held to account only for rents and profits of and for whatever amount of the land he or she used in excess of his own proper share; and for only two-thirds thereof, in this case, being allowed all proper expenditures for the common good or property.

9. "In not passing upon and sustaining plaintiffs' fourteenth exception to the special master's report, which is as follows:

" '14. In not finding, holding and reporting, that as between plaintiff and R. S. Thomas, the parties holding under the lease of G. W. Hill, they having all acquiesced in the holding by them under the terms of said lease, there could be no accounting for any excess of shares used by either; and that in any event, there should be an accounting between them, only two-thirds of the agreed rent to be paid under the said lease.'

"This exception makes the point, that in any event no accounting for rents and profits can be held and had between the parties holding and using the land for 1909, under the lease, they accepting the benefits thereunder by mutual agreement and standing together; and making no such claim of right at any time.

10. "In not holding, that the remaindermen and cotenants not in possession of any of the lands, must account and be held responsible for the rents of the J. Ed Gregory and Dawkins tracts for the year 1909, as lost to them through their own negligence and carelessness, in every phase of the case, and in any form of accounting.

11. "In sustaining the special master's report."

*Mr. J. Clough Wallace,* for plaintiff-appellants, cites: *No tenant required to pay unless he worked more than his share:* 14 S. C. 292; 53 S. C. 350. *Tenants in possession could only become tenants of remaindermen by new contract:* 18 Ency. 164; 17 Ency. 693. *There was no ouster:* 6 Rich. Eq. 425; 26 S. C. 180.

*Messrs. Marion & Marion,* for certain defendants-appellants, cite: *Lease of life tenant terminates on his death:* 38 How. Pr. 483; 33 Cen. Dig. 79; 18 Ency. 354; 1 Rich. Eq. 347; 1 Strob. 134; 66 Am. St. R. 476; 1 Strob. Eq. 58. *Remaindermen may recover rent:* 55 Am. R. 424; 3 Kent 470; 66 Am. St. R. 475; 1 Strob. Eq. 58; 1 Strob. L. 134; 67 S. C. 1. *Cotenant working more than his share should account for rents:* McM. Eq. 69, 475; 1 Hill Eq. 75; 14 S. C. 307; 18 S. C. 54; 53 S. C. 355.

*Messrs. Glenn & Glenn,* contra, cite: *Cotenant not chargeable for rent of her share:* 1 Hill Ch. 49, 86.

March 27, 1913. The opinion of the Court was delivered by

MR. JUSTICE FRASER.    This is an appeal from decree of his Honor, Judge Gage, confirming the report of J. G. Hughes, Esq., special master, made in the case, and for a proper understanding of the case the report of the master, the decree of Judge Gage and exceptions thereto, should be set out in the report of the case.    We think it unnecessary to take up the exceptions *seriatim,* as we think the decree in the main should be confirmed, but with this modification: That the contention of those holding under the lease made by life tenant could only be held to account for the rent provided to be paid in said lease.

Sec. 3496, Code of Laws, vol. I, 1912 (new Code), provides: "If any person shall rent or hire lands of a tenant for life, and such tenant for life dies, the person hiring such land shall not be dispossessed until the crop of that year is finished, he or she securing the payment of the rent when due."

In this case, the remaindermen were bound by the contract made by the life tenant.    Where a life tenant makes a contract for the lease of his life estate, for a valuable consideration, then the remaindermen are bound by the contract made by the life tenant and can collect the rent only provided for in that contract.

This is a remainder under a will.    Section 3563 of the Code of 1912 reads as follows:

"Any person having right or title to any lands, tenements, or hereditaments, whatsoever (persons of unsound mind and infants excepted), may dispose thereof by will, in writing, at his or her own free will and pleasure, except as hereinafter provided; but all wills or testaments made of any lands, tenements, or other hereditaments, by any person within the age of twenty-one years, idiot, or by any person *de non sane* memory, shall not be taken to be good and effectual in law."

The power to make a will is statutory.    The statute provides who may make a will and who may not.    It says how

it shall be executed and how revoked.  It provides that certain dispositions of property shall be void.  It provides that a certain estate, that had theretofore been a life estate, should thereafter be a fee simple.

The right to make a will is not a natural right.  The natural right to control property dies with the possessor.  It is not a constitutional right.  It is not mentioned there.  Though of ancient origin, the right is a creature of statute and may be abridged at any time by the lawmaking power.

When this will was made; when it became of force and when these remainders arose, this statute was in force.  Therefore the will and all rights under it came into existence subject to the statute.  At the time the rights vested, they vested subject to the statute.  Remainders could be forbidden.  The same power that created a fee, in all of those lands devised, in which the estate was not inconsistent with a fee, could have provided that in every event and in defiance of the limitation the first taker should take a fee and declare all remainders void.  It did not declare the remainder void, but it said to the remainderman, you can not get possession of agricultural lands until the end of the year.  If the statute had the right to prevent the disposition altogether, it certainly had the right to postpone the exercise of the right of possession.  The difficulty, however, is not in the postponement of the possession without the consent of the remainderman, but that the rent should be fixed by the life tenant and not by the "consent" of the remaindermen.  If the law can withhold the land it can also withhold a mere incident like rent.  If the life tenant can not make a binding contract for rent, neither can he make a contract that withholds the land itself.  It is said that the tenant must pay a reasonable sum for the use and occupation.  Who is to say what is a reasonable sum?  Manifestly the Courts must fix the amount.  If the remainderman has a constitutional right upon which he is entitled to stand, then, that constitutional right is *"consent."*  The Court can not supply the want of

consent if the right of consent exists.    As to public policy:
on the one hand, some life tenants may let their estates at
unreasonably small rents.    On the other, the income to be
derived from property held by life tenants would be nothing
if, upon the death of the life tenant, the tenant for a year
must make a new contract with an unknown and unknowable
remainderman, whose demands are limited only by his con-
science and that may be elastic.    Thus the life tenant, the
immediate object of the testator's bounty, may be deprived
of the entire benefit of a valuable estate.

The remainderman takes the estate subject to the burden
of a lease (that can not exceed a year) and the statute that
imposes the burden is in all respects fair and entirely con-
stitutional.

After the life tenant dies, the remaindermen can require
the tenant to secure the payment of the rent when due.    In
this case the tenants under the life tenant are liable to pay
the remaindermen two-thirds (2-3) of what they had con-
tracted with George W. Hill, the life tenant, to pay for the
year.

It is the judgment of this Court that the decree of the
Circuit Judge be modified in accordance with the views indi-
cated herein.

Judgment modified.

MESSRS. JUSTICES WOODS *and* WATTS *concur.*

MR. JUSTICE HYDRICK, *dissenting.*    I cannot assent to
the proposition that the remaindermen are bound by the lease
made by the life tenant.    If they are so bound, it is only by
virtue of the statute, for it can not be on account of any
privity of contract or estate.    There is no doubt that the
estate of a life tenant terminates with his life.    Necessarily,
any grant or lease made by him must also terminate upon his
death.    This being so, at common law, upon his death, the
remainderman was entitled to immediate possession.    This

frequently resulted in great inconvenience and hardship where the life tenant died after his undertenant had prepared for, or, perhaps, had planted and had in course of cultivation, the crops of the year, for remedy of which, in 1789, the legislature enacted a statute with regard to slaves and lands hired or rented from life tenants which, omitting parts not pertinent to the present inquiry, reads: "If any person shall die after the 1st day of March, in any year, the slaves of which he or she was possessed, whether held for life or absolutely, and who were employed in making a crop, shall be continued on the lands, which were in the occupation of the deceased, until the crop is finished, and then be delivered to those who have the right to them. * * * And if any person shall rent or hire lands or slaves of a tenant for life, and such tenant for life dies, the person hiring such land or slaves shall not be dispossessed until the crop of that year is finished, he or she securing the rent or hire when due." 5 Stat. 111. The last sentence of this statute, with the words making it applicable to the hiring of slaves stricken out, now appears as section 3496, Civil Code, 1912, and is the statute upon which the appellants base their contention that the remaindermen are bound by the contract made by the life tenant.

The effect of such a construction of the statute is to enable the life tenant, by leasing the property, to practically continue his estate therein through the year in which he dies. Such effect can not be given to the statute, without making it unconstitutional, for, in that event, the remainderman is deprived of his property, without his consent, and without due process of law. It simply allows one man to barter away the rights of another, without his knowledge or consent. It is directly in conflict with the principle decided in *Cureton* v. *Ry.*, 59 S. C. 371, 37 S. E. 914, and the cases following it, which hold that a life tenant can convey no greater interest than he has in the premises; and that, to allow a deed from the life tenant to a railway corporation

for a right of way through the land in which he has only a life estate to have the effect of foreclosing the rights of the remaindermen to compensation for the right of way would violate that provision of the Constitution which says, "that private property shall not be taken for private use, without the consent of the owner, nor for public use, without just compensation being first made therefor." Art. I, sec. 17.

Now, unquestionably the remainderman is the owner after the expiration of the life estate, and it is inconceivable that the legislature would attempt to make contracts made by the life tenant, without the knowledge or consent of the remainderman, and perhaps greatly against his interest, binding upon him. Such legislation would violate the fundamental principles of right, and, therefore, such a construction of the statute must be avoided; for it is well settled that, in construing a statute, that construction which will render it unconstitutional must be avoided, if possible. This may be done, in construing this statute without violating any right, or rule of construction.

Another principle of construction that may be invoked is that where a statute is in derogation of common law and of common right, it must be strictly construed. The statute in question clearly impairs the common law rights of remaindermen. *Huff* v. *Latimer,* 33 S. C. 260, 11 S. E. 758. Therefore, when the statute says that the tenant shall not be dispossessed, he securing the rent when due, what rent is meant and to whom is it to be secured? That question was answered in *Freeman* v. *Tompkins,* 1 Strob. Eq. 54, 58, where the Court said: "When the act says the hirer shall secure the payment of the rent and hire, it means that he shall secure to the remainderman the proportion of it which arises after the accrual of the remainder. The proportion arising in the terms of the life tenant is already secured to *him* by the contract of hiring. But how does rent accrue to the remainderman? Certainly not under the contract made by the life tenant, for to that the remainderman is

neither party nor privy.   It accrues by virtue of an implied
promise on the part of the undertenant, who remains in
possession, under the protection of the statute, and uses the
remainderman's property, to pay him a reasonable rent
therefor.   This case falls squarely within the provisions of
section 3503, Civil Code, 1912, which was enacted before
the section we are considering.   It provides for the recovery
by the landlord of a "reasonable satisfaction" for the use
and occupation of lands, etc., where the agreement is not by
deed.   This ground of recovery was enforced in *Freeman*
v. *Tompkins, supra*.   In that case, Mary Freeman, the life
tenant of certain slaves, died in May, having possession of
the slaves.   After her death, her trustees took charge of
them and retained them for several years.   The question
was, whether, under the statute, her estate was entitled to the
use of the slaves for the portion of the year after her death,
without compensation to the remaindermen.   It will be
observed that, under the first sentence of the act above
quoted, her representatives had the right to use the slaves,
until the crop was finished, and nothing is said about com-
pensation.   The Court held, however, that her estate was
liable for a reasonable hire.   At page 59 of the report, the
Court said: "It is plain that the legislature looked to the
injury which would result from interrupting the planting
operations after that season when preparations for the crop
are usually in progress; and intended to secure against the
consequences of a sudden change of the right of property
by the death of the party, in faith of whose title the crop was
set.   As a matter of convenience, it was provided that, in all
cases where the crop was superintended by the executor of
the decedent, it should constitute assets in his hands.   But
it by no means follows that, when it is raised by means of
slaves *or lands* which, on the death of his testator, become
the property of a remainderman, these shall be used without
compensation.   Certainly the act does not 'continue the
estate of the life tenant,' as it is expressed in *Leverett* v.

*Leverett,* 'to the end of the year.' There can be no doubt that, if it were necessary to vindicate the title to the property (the land, for instance), the suit must be brought in the name of the remainderman. The only object of the statute was to prevent great injury from the loss of a crop planted, and to obviate the difficulty of employing laborers after the beginning of the planting season. This is an essential benefit to the estate of the life tenant; *though that estate, into whose service the remainderman's property is pressed, should be compelled to pay an equivalent for the services rendered* (italics added). And it is no greater hardship that the life tenant's estate should pay for these services than a person to whom he hires the property,—which is expressly provided for in the statute." By parity of reasoning, neither the estate of the life tenant nor his undertenant should be allowed to have the use of the remainderman's land without rendering a fair equivalent.

If we hold that the remainderman is bound by the contract of the life tenant, made upon valuable consideration, it will frequently result in the loss of practically a whole year's rent to the remainderman. Suppose the life tenant should lease the premises in consideration of his own maintenance and support by the lessee? Now, that is a valuable consideration. Yet, if the remainderman is bound by it, he could not dispossess the undertenant upon the death of the life tenant, nor could he collect any rent for the use of his property for the balance of the year. Considerations of blood and affection may and frequently do cause the life tenant to lease the premises at a merely nominal rent; and that is practically the case here, for, as gathered from the record, the consideration of the lease was $150 and the support of the life tenant, while the testimony shows that the rental value of the property is upwards of $4,000. Surely, the legislature did not contemplate or intend such consequences; and, when read in the light of the then existing law and the evils which it was intended to remedy, the language

of the statute does not warrant an interpretation which will lead to any such result.

One who goes into possession under a life tenant is charged with notice of his landlord's title, and that it is liable to terminate at any moment. If it terminates in the midst of the year, the statute saves him from being dispossessed, and there is no hardship in holding him responsible to the remainderman for a reasonable rental, after the death of his landlord. The statute does not compel him to retain the possession. He may quit, without liability to the remainderman. And that, too, goes to show that the remainderman ought not to be bound by the contract, because the tenant is not, and mutuality is wanting. Usually, his own interest would impel the tenant to remain in possession; but if he does, it is of his own free will, and he should, therefore, be held thereby to an implied promise to pay the remainderman a reasonable rent. The foregoing views are supported by authority. *Hoagland* v. *Crum,* 113 Ill. 365, 55 Am. Rep. 424; *Guthman* v. *Vallery,* 51 Neb., 824, 66 Am. St. Rep. 475; *Williams* v. *Caston,* 1 Strob. L. 130.

MR. CHIEF JUSTICE GARY *concurs.*